**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————— :

FATIMAH BINT ABDULLAH,

             :

           Plaintiff,                   Civil Action No. 12-4202 (RBK)

             :

      v.

             :

STATE OF NEW JERSEY et al.,             **MEMORANDUM   OPINION**

             :                  **AND ORDER**

           Defendants.

—————————————————— :

IT APPEARING THAT:

1.     This matter comes before the Court upon the Clerk's receipt of a set of submissions made

       by the individual designating herself as "Fatimah Bint Abdullah"[1] ("Plaintiff"); these

       submissions suggest Plaintiff's desire to remove a certain state proceeding to this District.

       See Docket Entries Nos. 1 and 1-1.

2.     Since Plaintiff's submissions: (a) make references to removal of a state proceeding to this

       District; and (b) indicate, in no ambiguous terms, that the submissions at bar fall within

       the category of what has become known as "Marrakush" filings, the Court finds it

       warranted to detail, prior to examination of the factual predicate asserted and allegations

---

      [1] There appears to be no doubt that Plaintiff's name used by the state courts and state officials is "Carmella Walker," see Docket Entry No. 1, at 3, and "Fatimah Bint Abdullah" is merely her self-granted/self-selected alias. The Court takes this opportunity to remind Plaintiff that, pursuant to Local Rule 11.1, each pleading must be executed under the litigant's *official* name. In addition, in light of Plaintiff's references to "straw person" and having her name "registered" or "reserved," and for the reasons detailed below, the Court notes its concern with what might be an illegal UCC 9 activities undertaken or about to be undertaken by Plaintiff.

raised in this matter, the deficiencies necessarily plaguing all such "Marrakush" filings, and, in addition, the statutory requirements associated with any removal efforts.

3.      A party to a state action cannot, at a mere whim, remove his/her state proceedings to the federal forum; rather:

a.      Removal of a state court action to federal court is proper only if the federal court would have had original jurisdiction over the matter.  See 28 U.S.C. § 1441(a)-(b); Hackensack Univ. Med. Ctr. v. Lagno, 2006 U.S. Dist. LEXIS 80497 (D.N.J. Nov. 3, 2006).  In order to avoid remand, the removing party must show that federal subject matter jurisdiction exists and that the removal was proper. See Boyer v. Snap-On Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990), cert. denied, 498 U.S. 1085 (1991).  The Court of Appeals guided that "the party asserting federal jurisdiction in a removal case bears the burden of showing, at all stages of the litigation, that the case is properly before the federal court." Frederico v. Home Depot, 507 F.3d 188, 193 (3d Cir. 2007) (citing Samuel-Bassett v. KIA Motors Am., Inc., 357 F.3d 392, 396 (3d Cir. 2004)).[2]  If federal question jurisdiction is lacking, the action must be remanded to state court.

_____

[2]  District courts also have original jurisdiction over all civil actions between citizens of different states if the amount in controversy exceeds $75,000, exclusive of interest and costs. See 28 U.S.C. § 1332(a).  Thus, if an action originally filed in a state court could have been brought in federal court pursuant to diversity jurisdiction, the defendant generally may remove it to federal court if the procedural requirements for removal are met and removal is not barred by the forum defendant rule.  See 28 U.S.C. §§ 1441(a) & (b); see also id. at § 1446.  Complete diversity, however, is required.  See Caterpillar Inc. v. Lewis, 519 U.S. 61, 68, 117 S. Ct. 467, 136 L. Ed. 2d 437 (1996).  Where complete diversity is absent or the amount in controversy is not met, the federal court does not have subject matter jurisdiction over a removed action, and it must remand the action to the state court.  See 28 U.S.C. § 1447(c); Balazik v. Cnty. of Dauphin, 44 F.3d 209, 213 (3d Cir. 1995).

Notably, removal statutes are strictly construed against removal, and all doubts are resolved in favor of remand.  See Samuel-Bassett, 357 F.3d at 396; USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 206 (3d Cir. 2003) ("[C]ourts construe removal statutes strictly with all doubts resolved in favor of remand").

b.    To properly remove a case from state court to federal court, a notice of removal must be filed in the federal court within thirty days after receipt, "through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based."  28 U.S.C. § 1446(b).  The thirty day limitations period for removal is mandatory and cannot be extended by the court.  See Galvanek v. AT & T, Inc., 2007 U.S. Dist. LEXIS 81764 (D.N.J. Nov. 5, 2007).  The party seeking removal bears the burden of establishing that the notice of removal was filed in a timely manner.  See Rosebud Holding LLC v. Burks, 995 F. Supp. 465, 467 (D.N.J. 1998).  Indeed, under 28 U.S.C. § 1447(c), a case may be remanded to state court on the ground of a defect in the removal procedure, including a failure to file a notice of removal within the thirty day limitations period.  See Galvanek, 2007 U.S. Dist. LEXIS 81764, 2007 WL 3256701, at *2 (citing Foster v. Chesapeake Ins. Co., Ltd., 933 F.2d 1207, 1212-14 (3d Cir. 1991)).

4.    Moreover, a litigant initiating a civil action in a federal forum (or seeking removal to a federal forum) must submit a valid pleading and either prepay the applicable filing fee or duly apply for in forma pauperis status.  A "Marrakush" filing fails to operate as a valid

pleading or as a cognizable in forma pauperis application.  This Court already clarified that

> Two concepts, which may or may not operate as interrelated, color the issues at hand.  One of these concepts underlies ethnic/religious identification movement of certain groups of individuals who refer to themselves as "Moors," while the other concept provides the basis for another movement of certain groups of individuals, which frequently produces these individuals' denouncement of United States citizenship, self-declaration of other, imaginary "citizenship" and accompanying self-declaration of equally imaginary "diplomatic immunity."

> [a].    Moorish Movement

> In 1998, the United States Court of Appeals for the Seventh Circuit – being one of the first courts to detail the concept of Moorish movement, observed as follows:

>> [The Moorish Science Temple of America is a] black Islamic sect . . . .  [T]hree-fourths of its temples (congregations) are inside prisons.  The Moors, as adherents to the Moorish Science Temple are called, have their own version of the Koran and a list of prophets that includes, in addition to the prophets recognized by orthodox Islam, Buddha, Confucius, and the founder . . . of the Moorish Science Temple . . . .  Two groups vie for leadership of the sect: one in Mt. Clemens, Michigan, headed by [someone referred to as] Grand Sheik/Moderator Brother R. Love-El, and one in St. Louis headed by [someone referred to as] Grand Sheik Jerry Lewis-Bey. (The suffixes "El" and "Bey" refer to the African tribes from which the Moors believe black people are descended.)

> Bey v. Lane, 863 F.2d 1308, 1309 (7th Cir. 1998).[3]

> [b].    "Redemptionism," "Paper Terrorism" and Related Concepts

>> Shortly after the concept of Moorish movement was outlined by the Seventh Circuit, discussions of another movement appeared on

---

[3]   The underlying term "Moors" seemingly reflects the adherents' interest in highlighting their actual or alleged "ancestry in ancient Moors, i.e., the seventeenth century Muslims of the Islamic Iberian Peninsula and North Africa, who were of Berber and Arab descent."  Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057, at *4, n.1 (D.N.J. July 30, 2009).

the pages of legal opinions issued by the federal judiciary; that other movement was dubbed as "sovereign citizenship" movement. This movement was fostered by

> a loosely organized collection of groups and individuals who have adopted a right-wing anarchist ideology originating in the theories of a group called the Posse Comitatus in the 1970s. Its adherents believe that virtually all existing government in the United States is illegitimate . . . . [Therefore, such] "sovereign citizens" wage war against the government and other forms of authority using "paper terrorism" harassment and intimidation tactics, and occasionally resorting to [physical] violence.

Sovereign Citizen Movement, Anti-Defamation League, at <<http://www.adl.org/Learn/ext_us/SCM.asp?LEARN_Cat=Extre mism&LEARN_SubCat=Extremism_in_America&xpicked=4&ite m=sov>> (visited on Mar. 31, 2011).[4]

---

[4]  The concept of "sovereign citizenship" does, occasionally, relate to the phenomenon of "world passports." "World passports," issued by the so-called World Service Authority ("WSA"), are not recognized, in the United States and in the majority of world nations, as substitutes to official documents, such as national passports or drivers' licenses. See, e.g., Eugenio J. Huot Calderon, The Concept of Puerto Rican Citizenship, 35 Rev. D.P. 321, 333-36 (1996); <<http://web.archive.org/web/20080307015819/http://foia.state.gov/masterdocs/07fam/ 07m1310.pdf>>.  A former-World-War-II-bomber-pilot-turned-peace-activist Garry Davis created the WSA in 1953 after renouncing his U.S. citizenship and gaining notoriety by picketing the United Nations to argue that world peace requires a global government rather than a system of nation-states. See Daniel Engber, What's a World Passport? Slate Mag. (Mar. 24, 2006).  The WSA has been promoting "world citizenship" by issuing documents largely similar in their appearance to regular national passports, which the WSA called "world passports," to any person who wanted to declare himself/herself "a citizen of the world." One can inexpensively obtain such "passport" by filling out an application form at the WSA website. See <<http://www.world government.org/>>.  Therefore, while some persons just denounce their United States citizenship under the claim of sovereign citizenship, see, e.g., Roche v. Attorney General, 2011 U.S. App. LEXIS 5773, at 1-2, nn. 1 and 2 (3d Cir. Mar. 21, 2011), others accompany their denouncements of United States citizenship by applications for "world passports" and attempts to use these passports as legally cognizable documents, sometimes for the purposes of perpetrating criminal schemes in the United States. See, e.g., Asghar v. State, 698 N.E.2d 879 (Ind. Ct. App. 1998).  Moreover, a person's denouncement of his/her United States citizenship (being occasionally accompanied by the person's obtaining of a "world passport") frequently produces a peculiar "side effect" in the form of that person's

Consequently, a decade after the Seventh Circuit's issuance of Bey v. Lane, the United States Court of Appeals for the Third Circuit noted a stream of government actions aimed at controlling the "paper terrorism" activities of sovereign citizens, which – by then – matured into a wide-spread criminal scheme, where the scheme participants' "self-legitimized" their names for the purposes of initiating fraudulent legal transactions. The Court of Appeals explained:

> Evidently, [adherents of this scheme have . . . built on] the "Redemptionist" theory, which propounds that a person has a split personality: a real person and a fictional person called the "strawman." . . . Redemptionists claim that government has power only over the strawman and not over the live person, who remains free [and, thus,] individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, [pursuant to this "theory,"] the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case of prisoners, to keep him in custody. If government officials refuse, [adherents of this scheme] file liens against [government officials] . Adherents of this scheme also advocate that [they] copyright their names to justify filing liens against officials using their names in public records such as indictments or court papers.

Monroe v. Beard, 536 F.3d 198, 203 and nn. 3 and 4 (3d Cir. 2008); accord Roche, 2011 U.S. App. LEXIS 5773, at 2 . . . .The "strawman" concept is, occasionally, presented/exploited somewhat differently by those redemptionists who claim that – at the moment of their denouncement of United States citizenship and/or their accompanying self-grant of imaginary alternative citizenship – their "strawman" incarnation became "deceased," and their live persons quasi-expatriated from the U.S. (while continuing their actual physical residence in the United States). In connection with this odd quasi-expatriation scheme, such

---

self-grant of alternative, imaginary citizenship which, in turn, results in that person's insistence upon his/her "diplomatic immunity" for the purposes of United States law or, better say, for the purposes of the "grantee's" attempts to avoid the reach of law. See, e.g., U.S. Dist. Court v. Ephriam, 2009 U.S. Dist. LEXIS 103284 (D. Kan. Nov. 4, 2009).

redemptionists often claim that their live persons: (a) hold "estates" in the form of actual physical bodies of their respective "quasi-deceased" strawmen;[5] and (b) reside in geographic locales "self-claimed away" from the United States.

[c].    Interplay Between Moorish and Sovereign Citizenship Movements

It does not appear that one's Moorish ethnic roots (or Moorish religious convictions, or both) have any reason to go hand-in-hand with one's adhesion to the sovereign citizenship movement (or with one's professing the theory of redemptionism, or with one's practice of "paper terrorism," claims of self- granted "diplomatic immunity," etc.).  However, and unfortunately enough, certain groups of individuals began merging these concepts by building on their alleged ancestry in ancient Moors (and/or on their alleged or actual adhesion to Moorish religious convictions) for the purposes of committing criminal offenses and/or initiating frivolous legal actions on the grounds of their self-granted "diplomatic immunity," which these individuals deduce either from their self-granted "Moorish citizenship" and from their correspondingly-produced homemade "Moorish" documents (or from correspondingly-obtained "world passports") or from a multitude of other, equally non-cognizable under the law, bases, which these individuals keep

---

[5]  This "estate" concept is legally deficient on its face.  As one court explained,

[such] "estates" of [litigants] cannot qualify as [actual] litigants since [these "estates"] offer no order by a probate court acknowledging the existence of these "estates" and, indeed, it would be surprising had such order been entered because it is well established that the body of a decedent cannot be an estate, or even a part of an estate.  See Greneker v. Sprouse, 263 S.C. 571, 574 (1975) (clarifying that the estate is limited to the real and personal of a decedent); see also In re Estate of Medlen, 286 Ill. App. 3d 860, 864 (Ill. App. Ct. 1997) (explaining that "there is no property right in a dead body, and the body forms no part of the decedent's estate . . ." and citing 22A Am. Jur. 2d Dead Bodies §§ 2 and 3 and In re Estate of Fischer, 1 Ill. App. 2d 528, 535, 117 N.E.2d 855 (Ill. App. Ct. 1954)); In re Estate of Moyer, 577 P.2d 108, 110 (Utah 1978) (same); Snyder v. Holy Cross Hospital, 30 Md. App. 317 (Md. App. Ct. 1976) (same).

Estate of Casimir v. New Jersey, 2009 U.S. Dist. LEXIS 78113, at *9 (D.N.J. Aug. 31, 2009).

creating in order to support their allegations of "diplomatic immunity."[6]

Murakush-Amexem, 790 F. Supp. 2d 241, 2011 U.S. Dist. LEXIS 51887 at *2-12 (footnotes in original).  The above-quoted Murakush-Amexem decision built on a prior determination reached in this District with regard to a group of nineteen actions of this type (hereinafter, collectively, "Marrakush Cases").  See Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057 (D.N.J. July 30, 2009).  Addressing the submissions made in these nineteen actions, the Marrakush Cases court noted that the filings "were heavily peppered by references to the Barbary Treaties, United Nations documents, United States Constitution, . . . United States President, etc., [incuded] copies of . . . the Barbary Treaties, the United Nations Declaration on the Rights of Indigenous Peoples, etc., . . . and riddle-like, self-created 'Marrakush' argot."  Murakush-Amexem, 790 F. Supp. 2d 241, 2011 U.S. Dist. LEXIS 51887 at *20-22 (footnotes and citations to

---

[6]  Such claims of "diplomatic immunity" are without merit.  As it was already observed,

[Plaintiffs err in conflating their] expatriation and [diplomatic] immunity arguments, since: (a) Plaintiffs seem to focus on an irrelevant fact that anyone may renounce his/her United States citizenship, but this fact in no way establishes that Plaintiffs actually expatriated in accordance with the applicable legal requirements, see, e.g., Memorandum Opinion for the Solicitor General of June 12, 2000, . . . ; Marks v. Esperdy, 315 F.2d 673 (2d Cir. 1963) . . . ; and (b) even if the Court were to hypothesize that Plaintiffs duly expatriated, the fact of expatriation has no effect on the state court's jurisdiction to conduct Plaintiffs' criminal proceedings.  See, e.g., Cohen v. Little Six, Inc., 543 N.W.2d 376 (Minn. Ct. App. 1996); see also Cara S. O'Driscoll, The Execution of Foreign Nationals in Arizona, 32 Ariz. St. L.J. 323 (2000); [accord] Casanova v. Fitzpatrick, 214 F. Supp. 425 (S.D.N.Y. 1963) . . . .

Casimir, 2009 U.S. Dist. LEXIS 78113, at *19, n. 8 (parenthetical explanations omitted).

Marrakush Cases omitted).  The legal position taken in such submissions is necessarily

deficient.

> [The key] feature present virtually in every submission made [in this type
> of cases] is these litigants' nearly invariable invocation of the Barbary
> Treaties (and, specifically, the Treaty with Morocco) in the context of
> challenging their searches, arrests, confinements, criminal proceedings,
> bails, fees, convictions, etc. that took place entirely within the United
> States territory and were effectuated by the law enforcement and judicial
> officers of the States of New Jersey, Delaware, Virginia, Florida, etc.
>
> All provisions of the Treaty with Morocco are, however, wholly inapposite
> to the type of challenges . . . .  As noted supra, the Treaty with Morocco
> was executed, as all Barbary Treaties, with the aim to: (a) eliminate, or at
> least curtail, the ill of piracy plaguing the coastal waters and ports of the
> post-medieval North African geopolitical bodies; and (b) eliminate, or at
> least halt the rise of, the fees charged by the rules of these geo-political
> bodies to the then-developing American merchantry for keeping "peace"
> in the ports and coastal waters subject to their dominion.  See Frank
> Lambert, The Barbary Wars: American Independence in the Atlantic
> World (2007).  It is, therefore, hardly surprising that the bulk of the
> provisions of the Barbary Treaties: (a) focused on issues of
> maritime/admiralty, war, merchant purchases/sales and akin matters; and
> (b) were set forth in terms of protections of "vessels."
>
> This is particularly obvious in the Treaty with Morocco, which was a short
> accord consisting of mere twenty-five Articles, with only three Articles
> focusing not on acts of war, vessels, merchant activities, etc. but on the
> acts against generic civilian human beings.  See 1836 U.S.T. LEXIS 10,
> arts. 6, 20 and 21.   . . .  None of these three Articles could be read as
> applying to habeas or civil rights claims raised by [the "Murakush"
> litigants] against state police or prosecutorial officers, or judges, as to the
> claims based on the events of [their] arrests, incarceration, bailing,
> prosecution, convictions, etc.  See, e.g., Seals-Bey v. Cross, 2010 U.S.
> Dist. LEXIS 87794 (N.D. W. Va. July 23, 2010) . . . .  Indeed, Article Six
> of the Treaty, was fashioned to prevent undue enslaving of American
> citizens (and also to prevent theft of American citizens' goods) in the
> Mediterraneans by pirating Moors who were either of Morrocan or of non-
> Morrocan domicile and who were taking undue advantage of the passage
> ways, trade, accommodations, etc. in Moroccan coastal waters and ports.
> This Article is facially inapplicable to the [events which did] not occur
> anywhere near the coastal waters and ports of the Kingdom of Morocco

and, to top it all off, were not conducted by Moors.  See Thomas H. Lee, The Safe-Conduct Theory of the Alien Tort Statute, 106 Colum. L. Rev. 830, 876 (2006) (under the "Treaty with Morocco, . . . the locus of the [T]reaty partners' interaction [was] confined to the Mediterranean and therefore not within the [geographical] jurisdiction of the United States"); accord Pitt-Bey v. District of Columbia, 942 A.2d 1132 (D.C. 2008) (a self-proclaimed "Moorish" minister has no diplomatic immunity protection from criminal proceedings conducted within the United States territory).  Analogously, Articles Twenty and Twenty-One of the Treaty are facially inapplicable to [the "Murakush' litigants], since they had no right to consular assistance, and no United States citizen killed or wounded them in the Mediterranean: all the events they complain about occurred] well within the borders of the United States . . . .  See United States v. Casey, 2005 U.S. Dist. LEXIS 39785 (E.D. Mo. July 21, 2005) (the decision to criminally prosecute a self-declared "Moor" is constitutionally independent of any consular interest in assistance) (citing United States v. Ortiz, 315 F.3d 873, 886 (8th Cir. 2002); United States v. De La Pava, 268 F.3d 157, 165-66 (2nd Cir. 2001); United States v. Emuegbunam, 268 F.3d 377, 391-94 (6th Cir. 2001); United States v. Lombera-Camorlinga, 206 F.3d 882, 885-86 (9th Cir. 2000); United States v. Cordoba-Mosquera, 212 F.3d 1194, 1195-96 (11th Cir. 2000)).  Two conclusions ensue from the aforesaid analysis.  The first one is that all . . . claims challenging any events . . . that occur within what is the United States' actual geographical territory (and, especially, if these events involve those individuals who reside within that territory) cannot implicate *any* provision of the Treaty with Morocco.  The second conclusion, building on the prior one, is that all such . . . claims . . . are necessarily frivolous which, in turn, means that any pleading asserting such claims is not bona fide and warrants no examination on merits.

> [I]t is well-recognized . . . that such organizations as the Moorish American Nation and [similar imaginary creations, like] the Nation of Washitaw, are:
>
> > notorious organization[s] of scofflaws and ne'er-do-wells who attempt to benefit from the protections of federal and state law while simultaneously proclaiming their independence from and total lack of responsibility under those same laws.  Sanders-Bey v. United States, 267 F. App'x 464, 466 (7th Cir.2008) (finding that "the Washitaw Nation . . . is not recognized by the United States government"); Bybee v. City of Paducah, 46 F. App'x 735, 736-37 (6th Cir.2002) (finding that the "Nation of

Washitaw" is "fictional"); <u>United States v. Gunwall</u>, 1998 U.S.App. LEXIS 18596, at *11 (10th Cir. Aug. 12, 1998) (rejecting claim that the court had no jurisdiction over a member of the Washitaw as "frivolous"); <u>Bey v. Louisiana</u>, 2008 U.S. Dist. LEXIS 91606 (W.D. La. July 11, 2008) (finding that plaintiff's claim to land as a member of the Washitaw was "patently frivolous" and rested on documents of "dubious legal significance"); <u>Great Seal Nat'l Ass'n of Moorish Affairs v. 46th Dist. Ct. of Oakland County</u>, 2007 U.S. Dist. LEXIS 3199, at *2 (E.D. Mich. Jan. 17, 2007) (dismissing claim that plaintiffs owned several parcels of property by virtue of their Moorish ancestry as "baseless, fantastic and delusional" and finding the complaint to be "indecipherable"); <u>Khattab El v. U.S. Justice Dep't</u>, 1988 U.S. Dist. LEXIS 544, at *5 (E.D. Pa. Jan. 22, 1988) (holding that "the United States has not recognized the sovereignty of the Moorish Nation, thus precluding sovereign immunity claims").

<u>El-Bey v. United States</u>, 2009 U.S. Dist. LEXIS 33838 (M.D.N.C. Jan. 26, 2009). Any claims or arguments raised by Plaintiff which are based on his membership in the Moorish American Nation are [by definition] frivolous.

<u>Hampton v. City of Durham</u>, 2010 U.S. Dist. LEXIS 100255, at *6-8 (M.D.N.C. Sept. 22, 2010).

<u>Murakush-Amexem</u>, 790 F. Supp. 2d 241, 2011 U.S. Dist. LEXIS 51887 at *78-88 (footnotes omitted).

5.      Having reviewed the requirements of the removal statutes and the key features rendering all "Marrakush" filings <u>ab initio</u> deficient, the Court now turns to the submissions at bar. These submissions are subdivided into two groups, <u>see</u> Docket Entries No. 1 and 1-1, and, basically, suggest that Plaintiff and a certain Deborah Tribbett ("Tribbett") were former acquaintances who eventually developed frictions as a result of Plaintiff's dissatisfaction in the share of a certain inheritance Plaintiff had received or was/is

standing to receive.  See, generally, id.  Although the exact chronological order of the underlying events is hard to determine from the submissions at bar, the basic facts can easily be pieced together.  Specifically, it appears that a certain John Knight Sr. ("Knight-Sr"), who lived in Gloucester County, New Jersey, passed away more than a quarter century ago, i.e., on January 27, 1986.  It also appears that he died intestate (even though he might have executed some form of a living will, i.e., a legal document stating his wishes regarding receipt or denial of life prolonging medical treatment), and his about-$50,000 estate had become subject to state probate proceedings, which resulted in appointment of his son, John Knight Jr. ("Knight-Jr") as the estate administrator.   A number of persons (including Tribbett and Plaintiff) made claims against the estate but either had their claims refused by Knight-Jr or became dissatisfied with the actions of Knight-Jr for some other reasons.  Correspondingly, on May 14, 2008, Plaintiff, Tribbett and four other individuals retained the legal services of a certain Paul E. Melletz, Esq. (""Melletz), with the goal of seeking removing Knight-Jr from his position of the administrator of Knight-Sr estate.  Melletz's efforts to that effect proved successful, and – on August 20, 2008 – Knight-Jr was removed from his position as the administrator and substituted by Tribbett, who has been acting as the administratrix of Knight-Sr estate ever since and who retained Melletz as the estate's counsel for the purposes of winding it down and filing the final account with the Gloucester County division of the Superior Court of New Jersey, Probate Part.  On June 14, 2012, Tribbett – acting through Melletz – filed such final account; that filing was duly made in the originated-in-1989 Knight-Sr probate action and, hence, became subject for review and approval of Surrogate Judge

Helen M. Reed.  <u>See</u> Docket Entry No. 1, at 8.  While the content of that final account is not immediately apparent from the submissions at bar, there appears little doubt that Plaintiff was dissatisfied with the share she received – or was standing to receive – as a result of that final account; Plaintiff's dissatisfaction prompted her to commence the instant proceeding in this District.

6.     Toward that end, Plaintiff filed with the Clerk of this Court a civil cover sheet asserting "federal-question" jurisdiction and designating, as the basis for such federal-question jurisdiction, Section 241 of Title XVIII, <u>see</u> Docket Entry No. 1, at 2; she accompanied the same with a claim that Tribbett engaged in "conspiracy against [Plaintiff's] rights." <u>Id.</u>  Moreover, Plaintiff added another document, asserting that she was "removing" Knight-Sr probate proceedings to this District.  <u>See id.</u> at 7.  In her "Notice of Removal," Plaintiff asserted that Tribbett engaged in "Conspirary [to de]fraud, concealment of truth, misrepresentation [and] unauthorized use of [Plaintiff's] name," etc.  <u>Id.</u>  The package filed by Plaintiff also includes: (a) Plaintiff's application to proceed in this matter <u>in forma pauperis</u>, even though Plaintiff indicated that she was having monthly income of $729.35; (b) a statement that she was not proceeding in this matter "pro <u>se</u>" because she wished to be designated "<u>sui juris</u>," that her official name "Carmella Walker" was being used without "due authorization," etc.  <u>See</u>, <u>generally</u>, Docket Entries Nos. 1 and 1-1.  However, the most concerning Plaintiff's submission is her fourteen-page single-spaced statement consisting of "Marrakush" argot, asserting her "Marrakush" position based on the Treaty with Morocco, demanding that the United States Supreme Court would rule that "Marrakush" individuals are entitled to certain special privileges, requesting this

Court to vacate all orders entered by the state surrogate court in Knight-Sr probate

proceedings, and – in addition – asking for: (a) $1 million in compensatory and $1

million in punitive damages from the State of New Jersey; (b) $1 million in compensatory

and $1 million in punitive damages from the New Jersey Superior Court; (c) $1 million in

compensatory and $1 million in punitive damages from Tribbett; and (d) $1 million in

compensatory and $1 million in punitive damages from a certain Francine Knight (who

was, seemingly, one of the beneficiaries of Knight-Sr estate).

7.    Plaintiff's application to proceed in this matter in forma pauperis will be denied.  True,

the Supreme Court held that one need not be absolutely destitute to qualify for in forma

pauperis status.  See Adkins v. E. I. DuPont De Nemours & Co., Inc., 335 U.S. 331

(1948).  In Adkins, P. V. Adkins filed a timely motion in district court requesting leave to

appeal the district court's decision in forma pauperis and stated, in her affidavit, that she

was a widow 74 years of age, that the estimated cost of her record on appeal was $ 4,000,

that all she owned was a house inherited from her husband which had been appraised at a

value of $ 3,450, and her only source of income was a small rent from parts of her home

without which she would not be able to purchase the necessities of life.  The district and

appellate courts refused to grant Adkins leave to appeal in forma pauperis because Adkins

had not mortgaged her home in order to raise money toward the cost of her appeal.  In

sum, the lower courts in Adkins concluded that the affidavit of poverty prerequisite of §

1915 required that a party desiring to proceed in forma pauperis must be able to show by

sworn affidavit that (s)he had contributed virtually his/her last dollar to the cost of

litigating the suit. The Supreme Court: (a) reversed and ruled that a federal court should

not use the affidavit of indigency requirement of § 1915 as a tool to force a party to prove that he is absolutely destitute before allowing that person to proceed in forma pauperis; but (b) clarified that the district court enjoys discretion to determine whether the payment of the fees would be unduly burdensome.  See id; see also Kinney v. Plymouth Rock Squab Co., 236 U.S. 43, 46 (1915).  Here, Plaintiff's monthly income exceeds *two* filing fees associated with commencement of this action.  Therefore, the Court has no basis to find that expenditure of $350 filing fee would be unduly burdensome to her.

8.      Moreover, even if the Court were to grant Plaintiff's in forma pauperis status, her submissions at bar cannot warrant relief.

a.      To the degree Plaintiff maintains that she is not as a pro se litigant but a "sui juris" party, her position is facially deficient.  The term "pro se" means "for oneself" or "on one's own behalf" and, as such, correctly describes Plaintiff's status in this matter, where she is proceeding without legal representation: she need not be a licensed attorney to represent herself.   In contrast, Plaintiff's resort to the term "sui juris" only underscores the deficiency of her legal position: the term "sui juris" does not mean "in one's own right," as Plaintiff seems to believe; rather, it means "of one's own laws" and, as such, it correctly underscores the invalidity of Plaintiff's legal position erroneously based on her self-serving and unwarranted reading of the Treaty with Morocco, which – as the lengthy discussion provided supra demonstrates – has no relevance to the case at bar: Plaintiff is neither a vessel nor a good seized by pirates in Moroccan coastal waters, nor is she a seaman or a merchant enslaved in the Mediterranean, and no "diplomatic

immunity" or any other special treatment is owed to her on the basis of her election to perceive – or represent – herself as a descendant of ancient Moors.  In other words, all Plaintiff's statements made in reliance on the Treaty come dangerously close to making mockery of this Court.  No such statement presents a viable claim.

b.   To the degree Plaintiff asserts a "removal" claim based on 18 U.S.C. § 241, there is nothing here to be "removed" – since no Section 241 action is pending in the state courts; indeed, it could not possibly be pending in state court since the provision is a *federal* criminal statute.  Simply put, Plaintiff's Section-241-based complaint presents an attempt to institute a criminal prosecution of Tribbett.  However, a private plaintiff cannot force a criminal prosecution because the "authority to initiate a criminal complaint rests exclusively with state and federal prosecutors."  Collyer v. Darling, 98 F.3d 211, 222 (6th Cir. 1996); Mercer v. Lexington Fayette Urban County Gov't, 52 F.3d 325 (6th Cir. 1995); Forney v. Woodridge Hosp. & Johnson City Med. Ctr., 2005 U.S. Dist. LEXIS 37257, at *6 (E.D. Tenn. Sept. 14, 2005); see also Savage v. Arnold, 403 F. Supp. 172 (E.D. Pa. 1975) (citing United States v. Blierley, 331 F. Supp. 1182 (W.D. Pa. 1971); Brown v. Duggan, 329 F. Supp. 207 (W.D. Pa. 1971); Spader v. Wilentz, 25 F.R.D. 492 (D.N.J), aff'd, 280 F.2d 422 (3d Cir.), cert. denied, 364 U.S. 875 (1960)).  Moreover, this Court is without authority to institute any criminal proceedings on Plaintiff's behalf, since

> [i]t is well established that private citizens can neither bring a
> direct criminal action against another person nor can they petition
> the federal courts to compel the criminal prosecution of another
> person.  See Maine v. Taylor, 477 U.S. 131, 137 (1986); Heckler v.
> Chaney, 470 U.S. 821, 832 (1985); Leeke v. Timmerman, 454 U.S.
> 83, 86-87 (1981); United States v. General Dynamics Corp., 828
> F.2d 1356, 1366 (9th Cir. 1987).  Accordingly, the district court [is
> obligated to] refus[e] fil[ing] criminal charges or . . . compel[ing]
> prosecution based on those charges.

Ellen v. Stamm, 1991 U.S. App. LEXIS 30558 (9th Cir. Dec. 19, 1991) (emphasis

supplied), cert. denied, Montalvo v. Stamm, 506 U.S. 1047 (1993).  The fact that

Section 241 makes references to "rights" alters nothing for the purposes of the

Court's analysis: the Court of Appeals expressly held that individuals "do[] not

have a private right of action to sue the defendants under 18 U.S.C. §§ 241 or

242."  Watson v. Washington Twp. of Gloucester County Public Sch. Dist., 413

F. App'x 466, 468 (3d Cir. 2011); see also Walsh v. Krantz, 386 F. App'x 334,

336 n.2 (3d Cir. 2010) (affirming a district court's determination that claim under

§ 241 was implausible on its face), cert. denied, 131 S. Ct. 801 (2010).  Therefore,

Petitioner's application to "remove" a Section 241 proceeding should be denied as

a facial non sequitur, and the same applies to her application to initiate a Section

241 proceeding.

c.   To the degree Plaintiff's submissions can be read as is striving to "remove"

Knight-Sr probate proceeding to this District, Plaintiff's application fares even

worse.  The probate proceeding was commenced between 1986 and 1989, which

means that Petitioner's application is untimely for *at least 23 years*.  Moreover, no

diversity jurisdiction could be asserted here, since all parties are, unquestionably,

New Jersey residents.  Analogously, no federal question could possibly be found, since the issues of probate are entirely state-law based.  In fact, it is axiomatic that – under the judicially created "probate exception" – federal courts have no jurisdiction to conduct any proceeding involving probate of a will or administration of an estate.  See Marshall v. Marshall, 547 U.S. 293 (2006). Consequently, neither Plaintiff's application for removal of Knight-Sr probate action nor Plaintiff's request for this Court's annulment of the orders entered by the state court in Knight-Sr probate proceeding could be squared with this Court's federal mandate.[7]  Therefore, Plaintiff's application for removal will be denied, for failure to establish jurisdictional basis and as untimely, and remand to the state forum will be ordered.[8]

d.    Finally, if – with a substantial dollop of imagination and focusing only of Plaintiff's one-line references to her "religious rights" and constitutional "right to travel" – the Court were to construe Plaintiff's complaint as a pleading striving to assert civil rights claims against the State of New Jersey, the Superior Court of New Jersey, Tribbett and a beneficiary of Knight-Sr estate (seemingly, Knight-Sr's widow, who, presumably, displeased Plaintiff by merely getting a share of the

---

[7]  Federal courts of equity have only the jurisdiction to entertain suits in favor of creditors, legatees and heirs and other claimants against a decedent's estate to establish their claims: so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court.  See Marshall, 547 U.S. 293.

[8]  In light of the oddity of the action at bar, the Court has no certainty that the surrogate court presiding over Knight-Sr probate proceeding was ever informed of the attempted removal.

estate larger than that Plaintiff wished her to receive), Plaintiff's claims would still be subject to dismissal.  Under the Eleventh Amendment, the State of New Jersey is immune from a suit for damages, see Will v. Michigan Dept. of State Police, 491 U.S. 58, 64, 70-71 and n.10 (1989); Grabow v. Southern State Correctional Facility, 726 F. Supp. 537, 538-39 (D.N.J. 1989); the same immunity renders the Superior Court of New Jersey, including its Probate Part, not a "person" for purposes of § 1983.  See Reiff v. Philadelphia County Court of Common Pleas, 827 F. Supp. 319, 324 (E.D. Pa. 1993) (citing Will v. Michigan Dept. of State Police, 491 U.S. 58, 70 (1989)).  Furthermore, Plaintiff's claims against both Tribbett and the beneficiary of Knight-Sr estate fail for a number of reasons, i.e.:

i.    The fact that Plaintiff's allegations are limited solely to self-serving labels and conclusions, and complete failure to state any factual heft with regard to any wrong, see Ashcroft v. Iqbal, 556 U.S. 662 (2009); Phillips v. County of Allegheny, 515 F.3d 224, 230-34 (3d Cir. 2008) ("[A] plaintiff's obligation [is] to provide the 'grounds' of his 'entitle[ment] to relief' [by stating] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . .  The threshold requirement of Rule 8(a)(2) [is] that the plain statement [must] possess enough [factual] heft . . . . [It is not] sufficient to allege mere elements of a cause of action; instead 'a complaint must allege facts suggestive of the proscribed conduct'") (citations omitted);

ii.     the workings of the abstention doctrine and/or the <u>Rooker</u>-<u>Feldman</u>

doctrine, <u>see</u>, <u>e.g.</u>, <u>Ciaffoni v. Supreme Court of Pennsylvania</u>, 550 F.

Supp. 1246 (W.D. Pa. 1982) (challenges to a probate action dismissed

under the <u>Younger</u> doctrine), <u>aff's</u> 723 F.2d 896 (3d Cir. 1983); <u>Williams</u>

<u>v. Adkinson</u>, 792 F. Supp. 755 (M.D. Ala. 1992) (same, under the <u>Rooker</u>-

<u>Feldman</u> doctrine), <u>aff'd</u> 987 F.2d 774  (11th Cir. 1993); and

iii.     Plaintiff's failure to meet the color-of-law requirement as to the

beneficiary and even Tribbett, the administratrix.  <u>See</u> <u>Cummings v.</u>

<u>Lacorte</u>, 2010 U.S. Dist. LEXIS 67451 (D.N.J. July 7, 2010) (court-

appointed executor of estate is not a state actor); <u>Keeney v. Donatelli</u>,

2007 U.S. Dist. LEXIS 9409 (E.D. Pa. Feb. 9, 2007) (court-appointed

administrator of estate is not a state actor for purposes of § 1983

complaint); <u>Patterson v. Rodgers</u>, 708 F. Supp.2d 225 (D. Conn. 2010)

(Section 1983 claims against attorney-executors of estate fail because they

are not state actors); <u>accord</u> <u>Polk County v. Dodson</u>, 454 U.S. 312, 325

(1981) (neither a privately retained counsel nor a court-appointed public

defender who performs a lawyer's traditional function as counsel could be

deemed acting under color of law); <u>Jacobs v. A Robert Depersia Agency</u>,

2009 U.S. Dist. LEXIS 23122 (D.N.J., June 30, 2009) (bondsmen are not

state actors unless act jointly with law enforcement personnel); <u>Kirtley v.</u>

<u>Rainey</u>, 326 F.3d 1088 (9th Cir. 2003) (court-appointed guardian does not

act under color of law); <u>Hall v. Quillen</u>, 631 F.2d 1154 (4th Cir. 1980)

(court-appointed physician is not a state actor), cert. denied, 454 U.S. 1141

(1982).[9]

9.    Since the above-detailed substantive deficiencies are fatal to Plaintiff's position, it

appears unwarranted to allow Plaintiff an opportunity to prepay her filing fee and file an

amended pleadings in this matter: Plaintiff's re-pleading would not overcome the

immunities of the State, the non-"person" status of the Superior Court of New Jersey, the

workings of the Younger and Rooker-Feldman doctrines, the operation of color-of-law

requirement, etc.  It does, however, appear warranted to stress to Plaintiff that federal

courts are an improper forum for "venting out" Plaintiff's emotions, including her

dissatisfaction with the share of Knight-Sr estate she received or stands to receive.  "The

courts in this nation stand ready to address challenges brought by litigants in good faith.

Which, in turn, means that the judiciary — including the Judges in this District — expect

---

[9] The Court also notes, in passing, that Plaintiff's "religious rights" claims cannot be stitched to her factual predicate.  To the extent Petitioner sees herself as "Marrakush," her secular views are not protected by the Free Exercise Clause: "[o]nly [religious] beliefs which are both sincerely held and religious in nature are protected under the First Amendment."  Sutton v. Rasheed, 323 F. 3d 236, 251 (3d Cir. 2003)  (citation and internal quotation marks omitted). And, even if Plaintiff has any religious beliefs, no aspect of probate of Knight-Sr estate could have imposed a ny burden, moreover the required "substantial burden," on her religious exercise. Cf. Pell v. Procunier, 417 U.S. 817 (1987).  With the same token, Plaintiff's "right-to-travel" challenges cannot be squared with the factual predicate she asserted.  "The constitutional right to travel . . . embrac[es] at least three components: (1) the right of a citizen of one state to enter and leave another state; (2) the right to be treated [by the state] as a welcome visitor rather than an unfriendly alien when temporarily present in the second state; and (3) for those travelers who elect to become permanent residents, the right to be treated like citizens of that state." Stephen C. v. Radnor Tp. Sch. Dist., 202 F.3d 642, 655 (3d Cir. 2000) (citing Saenz v. Roe, 526 U.S. 489, 500 (1999)).  Here, probate of Knight-Sr estate could not affect or have any relation Plaintiff's constitutional right to travel, and – if Plaintiff wished to imply that, had she received more money from the estate, she would have traveled more frequently (or with more luxury) – the "right" to "travel more" or "more luxuriously" is not a right constitutionally guaranteed.  See id.

litigants to treat their litigation with utmost seriousness, without abusing legal process

and without unduly testing of the resolve or common sense of the judiciary." In re

Telfair, 745 F. Supp. 2d 536, 580 (D.N.J. 2010).

> Th[is] Court does not know why [Marrakush litigants] have chosen to file
> their labyrinthine, multi-defendant. . . action[] . . . .  What the Court does
> know is that [such] actions appear frivolous on their face, and all have
> been filed at no cost to these litigants (given that they have not retained
> counsel, have not paid filing fees, and in most cases have filed facially
> insufficient, mockery-of-the-court-like IFP petitions).  In stark contrast to
> the numerous free rides through the federal judicial system that these
> litigants have been enjoying, their litigiousness has exacted and will
> continue to exact a heavy price on the finite resources of this District
> Court and other federal courts at district level and, hence, on litigants in
> other matters as to whom justice will be delayed while those scarce
> [judicial] resources are expended to process [Marrakush litigants'] bounty.
> See Miller v. Donald, 541 F.3d 1091, 1096 (11th Cir. 2008) ("Frivolous
> and vexatious law suits threaten the availability of a well-functioning
> judiciary to all litigants"); Procup v. Strickland, 792 F.2d 1069, 1072 (11th
> Cir. 1986) (en banc) ("Every lawsuit filed, no matter how frivolous or
> repetitious, requires the investment of court time, whether the complaint is
> reviewed initially by a law clerk, a staff attorney, a magistrate, or the
> judge").  The undersigned will not sit idly by as this District Court is
> inundated with harassing and vexatious litigation arising from whatever
> [Marrakush litigants'] perceived multimillion-dollar constitutional affront
> du jour might be.

Bethel v. Bosch, 2010 U.S. Dist. LEXIS 128065, at *13 (S.D. Ala. Dec. 2, 2010).  The

Court, therefore, strongly urges Plaintiff to refrain from future commencement of actions

– be they in this District or in any other federal court, or in state courts – with the goal of

abusing the judicial system or "venting out" Plaintiff's meritless personal spite, or

declaring her "Marrakush" beliefs.  Since the court system exists for the sole purpose of

resolving legal disputes, Plaintiff's abuses might result in sanctions, if appropriate.

IT IS, therefore, on this _____16th_____ day of _____July_____, 2012,

ORDERED that Plaintiff's applications to proceed in forma pauperis is denied; and it is further

ORDERED that, in alternative, Plaintiff's application for "removal" of criminal proceeding is denied, since no such proceeding is pending in state courts; and it is further

ORDERED that, in alternative, Plaintiff's application for commencement of criminal proceedings is denied, since Plaintiff has no private right of action to commence such proceeding; and it is further

ORDERED that, in alternative, Plaintiff's application for "removal" of a state probate proceeding is denied for lack of jurisdiction and, in addition, as untimely; and it is further

ORDERED that Plaintiff's civil challenges, if any, raised against the State, state court, state-appointed administratrix of estate, and a beneficiary of that estate are dismissed for failure to state a claim upon which relief can be granted.  Such dismissal is with prejudice, and no leave to prepay filing fee and submit amended pleading shall issue; and it is further

ORDERED that the state probate proceeding, if any such proceeding has been affected by Plaintiff's instant action, is remanded to the state court, and the Clerk shall notify the state court accordingly, directing such notice to the Gloucester County Surrogate Court, 17 North Broad Street, Woodbury, New Jersey 08096; and it is further

ORDERED that the Clerk shall serve this Memorandum Opinion and Order upon Surrogate Judge Helen M. Reed, Gloucester County Surrogate Court, 17 North Broad Street, Woodbury, New Jersey 08096.  Such service shall be executed by certified mail, return receipt requested, and accompanied by a notation reading, "SERVICE EXECUTED FOR INFORMATIONAL PURPOSES ONLY IN CONNECTION WITH AN ATTEMPTED

REMOVAL OF PROBATE ACTION INDEX 89-197, CAPTIONED IN RE ESTATE OF JOHN

EDWARD KNIGHT, SENIOR"; and it is further

ORDERED that the Clerk shall serve this Memorandum Opinion and Order upon Paul R.

Melletz, Esq., at 411 Route 70 East, Suite 245, Cherry Hill, New Jersey 08034.  Such service

shall be executed by regular U.S. mail accompanied by a notation reading, "SERVICE

EXECUTED FOR INFORMATIONAL PURPOSES ONLY IN CONNECTION WITH AN

ATTEMPTED REMOVAL OF PROBATE ACTION INDEX 89-197, CAPTIONED IN RE

ESTATE OF JOHN EDWARD KNIGHT, SENIOR"; and it is further

ORDERED that the Clerk shall serve this Memorandum Opinion and Order upon

Plaintiff.  Such service shall be executed by regular U.S. mail; and it is finally

ORDERED that the Clerk shall close the file on this matter by making a new and separate

entry on the docket reading, "CIVIL CASE CLOSED."


s/Robert B. Kugler
**ROBERT B. KUGLER**
**United States District Judge**